**SO ORDERED.**

**SIGNED this 8 day of August, 2019.**

_____
**Joseph N. Callaway
United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
NEW BERN DIVISION**

| | |
|---|---|
| **IN RE:** | |
| **ROBERT W. STEELE, II,** | Case No. 17-03844-5-JNC |
|     Debtor | Chapter 11 |
| _____ | |
| **SWIFT FINANCIAL CORPORATION
d/b/a SWIFT CAPITAL,**
    Plaintiff, | |
| **v.** | Adv. Pro. No. 17-00081-5-JNC |
| **ROBERT W. STEELE, II,**
    Defendant | |

**MEMORANDUM OPINION REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

The matters before the court are the Motion for Summary Judgment filed by the Plaintiff, Swift Financial Corporation d/b/a Swift Capital, Dkt. 38, and the Cross-Motion for Summary Judgment filed by Defendant Robert W. Steele, II, Dkt. 40. A hearing took place in Greenville, North Carolina on June 18, 2019.

**JURISDICTION**

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151 and 1334 and is authorized to hear this case under the General Order of Reference entered

August 3, 1984 by the United States District Court for the Eastern District of North Carolina. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(I), and the court has statutory authority to enter a final judgment in this case. In addition, the parties consented to this court entering final judgment on all matters raised in the adversary proceeding. *See* Pretrial Scheduling Order dated December 5, 2018, Dkt. 30. The court has constitutional authority to enter final judgment in this adversary proceeding. *Wellness Int'l Network, Ltd., v Sharif*, __ U.S. __, 135 S. Ct. 1932, 1947 (2015).

## PROCEDURAL HISTORY

Robert W. Steele II filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 4, 2017. On November 6, 2017, Swift Financial Corporation d/b/a Swift Capital ("Swift") filed the first complaint in this adversary proceeding, Dkt. 1. In it, Swift sought to establish the nondischargeability of a debt alleged to be owed to it by Mr. Steele in four counts under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6), respectively.

On March 14, 2018, the court entered an order allowing Mr. Steele's Motion to Dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,[1] Dkt. 11. However, the dismissal of the case was temporarily stayed to allow Swift an opportunity to amend its complaint and cure pleading deficiencies. On June 5, 2018, Swift filed an amended complaint, Dkt. 16, again seeking to establish that a debt alleged to be owed to it by Mr. Steele is nondischargeable, but only under three counts pursuant to §§ 523(a)(2)(A), (a)(2)(B), and (a)(4), respectively. The claim for nondischargeability made under § 523(a)(6) for willful and malicious injury was abandoned.

---

[1] Rule 12(b)(6) is applicable to adversary proceedings pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

Mr. Steele renewed his motion to dismiss and on September 21, 2018, an order was entered dismissing claims made in the amended complaint for exception from discharge under §§ 523(a)(2)(A) and (a)(2)(B) (Dkt. 23; the "Dismissal Order"). The third count contained in the amended complaint seeking an exception from discharge pursuant to § 523(a)(4) as a debt for embezzlement (the "Embezzlement Claim") survived.  After discovery, the parties filed cross-motions seeking summary judgment on the Embezzlement Claim.

## FACTS FOR SUMMARY JUDGMENT[2]

Swift is a lending or cash advance company that purchases (or loans against) the future sales and receivables of its customer businesses for a discounted present price.  In July 2016, the parties acknowledge that Swift, Mr. Steele's former business RSI, Inc. ("RSI"), and Mr. Steele as the guarantor of RSI, executed a contract entitled "Future Receivables Sale Agreement" and associated documents (Dkt. 1 at 7-21; the "Agreement").[3] Swift asserts that RSI failed to perform its duties under the Agreement through the alleged inequitable or fraudulent actions of Mr. Steele and that as a consequence he is indebted to Swift in the nondischargeable amount of $291,074.37 (the "Debt Amount").  Mr. Steele does not dispute that RSI contractually owes the Debt Amount to Swift for breach of contract and acknowledges for summary judgment purposes that Swift holds an unsecured claim against him, but disputes that the claim against him should be excepted from discharge under the Bankruptcy Code.

---

[2] The facts stated herein are those agreed by the parties, or where necessary, the version of the facts construed in the light most favorable to the party defending summary judgment. Because Swift and Mr. Steele have both moved for summary judgment, some of the factual recitation may not be consistent, and nothing herein shall be deemed a finding of fact for purposes beyond this order on the cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(g), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056.

[3] The series of documents and contracts executed in July 2016 constituting the Agreement are attached to the amended complaint as exhibits and were resubmitted by the parties as stipulated at the hearing. The face of the Agreement reflects an agreement date of July 6, 2016. Mr. Steel and his company signed the Agreement on July 6, 2016, and Swift signed it on July 14, 2016. Dkt. 1 at 7.

It is undisputed that in June 2016, Mr. Steele provided RSI financial information to Swift including RSI's balance sheet, profit and loss statement, accounts receivables, ongoing construction projects reports and related documents. After review of the RSI application and execution of the Agreement, on July 15, 2016, Swift wired $250,000 (the "Purchase Price") in two installments to RSI. The Agreement specifies that the Purchase Price bought twelve percent (12%) of RSI's "Future Receivables" to be collected until it receives the sum of $314,750 (the "Amount Sold"), payable in the form of 240 daily ACH debits of $1,311.46 each to be drawn from RSI's bank account. Dkt. 1 at 8. Paragraph A(2) on the second page of the Agreement obligates RSI and Mr. Steele to use the Purchase Price to fund RSI business operations and forbids using the Purchase Price for "personal, family, or household purposes."[4] Dkt. 1 at 9. Paragraph B recites that the repayment period is open-ended and is not collateral dependent:

> Because this is a sale and not a loan, there is no defined repayment term, (sic) there is no specific date by which the entire Amount Sold must be delivered to the Purchaser. If the Business's business slows down and the delivery rate of the Future Receivables decreases or the Business's business closes (and in each case Business has not otherwise violated the terms of this Agreement), there will not be an Event of Default under this Agreement.

*Id.*

RSI's daily ACH payments began on July 15, 2016 and continued without major incident for about two months. Beginning with the September 12, 2016, draw, however, that draft and all others for the week that followed were returned by RSI's bank for insufficient funds. Daily payments resumed the next week, but in October 2016 only two daily payments cleared.[5] By the end of October, the RSI account was closed or allowed to remain dormant and no further daily payments were made.

---

[4] Swift made no allegations that the Purchase Price was used for improper purposes.
[5] A relatively modest amount of funds was subsequently collected by account sweeps conducted by Swift as discussed below.

By early 2017, Mr. Steele had closed RSI and formed RWS, Inc. He continued to work in the construction industry, but no new receivables were created by RSI. Swift maintains that the primary purpose of the change was to avoid paying RSI's creditors, that RWS is an identical business to RSI, and that all assets of RSI were transferred to RSW without consideration. Swift further contends that Mr. Steele (i) knew and understood that the Agreement was conditioned on Swift's ability to debit the RSI bank account; (ii) purposefully diverted all new business to RSW; (iii) failed to fund the RSI bank account so that Swift would not receive payment; and (iv) misrepresented RSI's ability and intention to pay funds necessary to satisfy the Amount Sold.

## DISCUSSION

### A.    The Standard for Summary Judgment

A party is entitled to summary judgment if the undisputed facts established in the record "show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *Humboldt Express, Inc. v. The Wise Co. (In re Apex Express Corp.)*, 190 F.3d 624, 633 (4th Cir. 1999) (citations omitted). Any evidence in the record may be considered by the court if that evidence is stipulated, uncontested, or otherwise admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). The evidence need not be introduced in the form required at trial so long as "the substance or content of the evidence . . . [is] admissible . . . ." 11 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, ¶ 56.91[2] (3d ed. 2017).

The party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the initial burden is met, the opposing

party must respond and demonstrate the existence of factual disputes sufficient to advance a genuine issue to trial. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If no objection is made, the court may consider a possible objection waived and consider the evidence as presented. *See* Fed. R. Evid. 103(a).

"Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Therefore, if the moving party meets this initial burden in showing no genuine issue remains, the burden shifts for summary judgment. The defending party must then present evidence to the contrary or summary judgment will be appropriately granted.

**B.**     **Elements of Embezzlement**

The Embezzlement Claim, which seeks to except Swift's claim from Mr. Steele's discharge as arising from embezzlement, is the only remaining cause of action in this adversary proceeding.

6

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1985) (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 40 L. Ed. 422 (1895)). As previously noted by this court, three elements must be shown to prove embezzlement in the context of § 523(a)(4): "(1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit, (2) the deposit of the resulting funds in an account accessible only to the debtor, and (3) the disbursal or use of those funds without explanation of reason or purpose." *Federal Ins. Co. v. Sorge (In re Sorge)*, 566 B.R. 369, 381 (Bankr. E.D.N.C. 2017) (citing *Peavey Electronics Corp. v. Sinchak (In re Sinchak)*, 109 B.R. 273, 276 (Bankr. N.D. Ohio 1990)); *see also Continental Cas. Co. v. York (In re York)*, 205 B.R. 759, 764 (E.D.N.C. 1997) (embezzlement is "the fraudulent, or knowing and willful, misapplication or conversion of property which belongs to another, by a person to whom such property has been entrusted or onto whose hands it has lawfully come").

      **1.**     **Property of Another Entrusted to the Debtor**

          **a.**     **Loan vs. Purchase Transaction**

To oppose the element of entrustment of property of another, Mr. Steele contends that the claim is a debt from a loan disguised as a sale without the transfer of actual assets. He maintains that, as a result, RSI only pledged collateral to Swift. If title did not transfer, it follows that Swift did not entrust its property to RSI (or Mr. Steele). The resulting claim consequently originates from a garden-variety breach of contract. Swift, on the other hand, contends that it transferred the Purchase Price to buy the Future Receivables (actually 12% thereof) and the funds owed to RSI on those receivables were surreptitiously diverted to RSW by Mr. Steele, the control person of RSI and RSW.

Looking more closely at the transaction reflected in the Agreement, Mr. Steele is correct that it reflects a method to fund his business similar to but not exactly the same as a traditional "factoring" arrangement. A factor purchases receivables for a discounted price and is responsible for collection directly from the customer or through a lockbox. Conversely, a lender would loan money to the business, backed by collateral. The Agreement employs an increasingly popular hybrid arrangement for small business funding (often on an emergency basis) that *sells* a portion of the business's future cash flow but allows the business to collect its own receivables and retain cash flow so long as a minimum daily payment is made. This mechanism is used both in the form of selling future retail sale proceeds by a store merchant or future accounts receivable generated by a service business. The amount paid by the funding party is based on projected future sales and/or receivables that are deposited into a bank account, thereby creating cash available for daily draws. In retail, such sales are commonly known as "Merchant Cash Advances."[6]

The use of the term "Future Receivables" in the Agreement is virtually synonymous with "Merchant Cash Advances" for purposes of this analysis. Distinct from a loan, the payment obligations under a future receivables or merchant cash advance are not absolute. Future accounts and receipts purchased are paid via authorized daily drafts from the seller's designated bank account. The seller's obligation is contingent on its continued business operations and consequential generation of cash or account receipts. Guarantees are guarantees of performance, as opposed to payment, with liability tied to performance under the terms of the merchant cash advance agreement.

---

[6] For further discussion of merchant cash advance agreements in bankruptcy cases, *see Bircher v. Funding Metrics, LLC (In re A Goodnight Sleepstore, Inc.),* Adv. Pro. No. 17-00056-5-JNC, Dkt. 62 (Bankr. E.D.N.C. Jan. 25, 2019).

When terms of a contact are clear and unambiguous, a court must interpret the contract as written and words are to be interpreted based on their ordinary meaning. *FFP Holdings LLC v. Vitafoam, Inc.*, 576 Fed. Appx. 234 (4th Cir. 2014). Here, the Agreement by its plain terms, and on its first page in the boxed and bracketed area titled in bold capital letters "PURCHASE SUMMARY," contemplates a sale of an asset called "Future Receivables." Dkt. 1 at 8. At the bottom of that first page, in the last box, the Agreement clarifies that only 12% rather than all of RSI's Future Receivables are being bought and sold. *Id.* The term "Receivables" is defined on the third page of the Agreement as "all payment rights arising from or occurring as a result of your customers' purchases of goods and/or services from you, whether by cash, checks, money orders, electronic fund transfers . . . , payment cards . . . , extensions of credit or any other forms of payment now known or hereinafter developed." *Id.* at 10. The exact "Amount Sold" of the Receivables ($314,750) is quantified. Finally, as noted above and perhaps most tellingly, Page 2 Paragraph B specifically states the transaction "is a sale and not a loan" with "no defined repayment term." *Id.* at 9.

It is difficult to find a clearer meeting of the minds on this point. Outside of the sold assets, no collateral was posted. Other than the daily repayment amount contemplated ($1,311.46), nothing remotely hints at a loan; the "Purchase Summary" is defined and identified as a function of the "amount of the Future Receivables that are being sold to Purchaser." *Id.* at 8. Following the plain meaning of this language in addition to the clear and plain use of the words "purchaser" and "sold" demands a finding of a sale of assets rather than a loan of money under the Agreement. The fact that the assets sold are intangibles in the form of Future Receivables does not change the plain meaning into a loan. The Agreement represents a sale, not a loan.

### b. Entrustment

Rejection of the "disguised loan" defense, however, does not mean that Swift has prevailed on the first element as a matter of law. Swift still must provide evidence of exactly which Future Receivables of RSI came into existence and were diverted after default occurred in mid-September following the NSF return of daily payments. If it contends that the hard assets of RSI were transferred to RSW without consideration, that RSW took over RSI's jobs in progress, and that RSW is a vehicle of fraud, at least a modest amount proof of those allegations is required to survive summary judgment.

Rather than present evidence or even the forecast of evidence on these points, Swift instead merely rested on a copy of the full 15-page Agreement attached to the unverified amended complaint. No affidavit or other evidence in support of summary judgment (outside of three pages from the Agreement) was submitted by Swift at or before the summary judgment hearing. When asked the basis to find a diversion of receivables from RSI to RSW, Swift could only note that RSI went out of business at some point in late 2016 and that RSW began in 2017. However, no accounting or project analysis was presented to support the allegation that RSW picked up where RSI left off. Speculation alone without a tracing analysis proves nothing. Consequently, Swift is not entitled to summary judgment on this aspect of the case. The issue of exactly what and how much of the Future Receivables were entrusted or transferred without consideration remains for trial if summary judgment is not awarded on other grounds.

### 2. Use of Funds

Next, the court must consider whether the debtor appropriated the money or property for a use other than that for which it was entrusted. It is undisputed that RSI ceased operating by October 2016 and that Mr. Steele was using a new company (RSW) for construction activity. Swift

maintains that the creation of Future Receivables through RSW exclusively rather than RSI beginning in October 2016 satisfies the diversion element. Mr. Steele does not deny that RSI was closed in or after October 2016, that the actual daily payments made are reflected in the payment history, and that he operated through RSW beginning in the fall of 2016. Further, the bank account statements presented by stipulation of the parties shows that only nine daily payments of $1,311.46 each (a total of $11,803.14) cleared after September 12, 2016. *See* Dkt. 43, Exhibit D, at 15-17. If these payments represent 12% of the Future Receivables of RSI (or RSW if the corporate successor theory holds), this figure suggests there were $98,359.50 of total receivables. However, as was the case with the first element as discussed above, no analysis of assigned assets has been provided by Swift in this matter. On the other hand, no tracing defense has been provided by Mr. Steele either. As a result, neither party is entitled to summary judgment on the diversion element and this matter too remains for trial if summary judgment is not granted below.

### 3. Fraudulent Intent

Entrustment and diversion alone do not prove embezzlement. The claimant must also provide proof of a third element, namely that the misappropriation of the property of another was accomplished with fraudulent intent. Mr. Steele contends that the uncontested facts in the record affirmatively reflect an absence of fraudulent intent on his part and that Swift has not met its burden to rebut that showing. Swift contends that because Mr. Steele knew that revenue from receivables (whether in RSI or RSW) was earmarked and assigned to Swift, any use of the corresponding funds was an unauthorized disposal of the property of another, and the use alone shows the presence of fraudulent intent sufficient to grant summary judgment for it, or at least to survive the defendant's summary judgment motion.

11

Circumstances alone can indicate the possible presence of fraudulent intent. Perhaps in the absence of any showing to the contrary, an inference of fact akin to a badge of fraud would create an issue of fact for trial—as is the case with the first two elements as discussed above. However, upon the defending party submitting evidence to the contrary—that no fraudulent intent was present—a response by the moving party is required. Here, Swift failed to present any record evidence of fraudulent intent outside of the hypothetical circumstance noted, at best a minimal showing. No evidence of the subsequent amount of Future Receivables created, the amount purchased or assigned to it, the diversion of those assets, the continuation of RSI business by RSW, the actual use of Swift funds by the defendant or his companies, or any other evidence for that matter was presented by Swift at or prior to hearing on this subject.

Mr. Steele, on the other hand, presented considerable evidence of a lack of the requisite fraudulent intent on his part in his affidavit of May 7, 2019, Dkt. 43, and its attached exhibits.[7] For example, Exhibits E and F attached to the Steele affidavit are copies of a series of emails sent and received from September to December 2016 between Mr. Steele and Bonnie Carey, head of collections at Swift, and employees serving under her, including Dena Pickman. Dkt. 43 at 45-57. Many of the emails sent by Mr. Steele were not responded to by Swift. His repeated requests for payment restructure and other reformation of terms in the Agreement due to business reversals, and with constant warnings that RSI would soon be financially incapable of funding the daily draws at the current payment rate, put Swift on notice that insufficient "Future Receivables" were being generated at RSI.

The Agreement in fact specifies that if "business slows down, and the delivery rate of the Future Receivables decreases or the Business's business closes . . . there will not be an Event of

---

[7] No objection to the Steele affidavit and its attachments was made by Swift, so the emails and other documents presented in it may be considered as evidence in considering summary judgment.

12

Default." Dkt. 1 at 9. Because of the business reversals, as contemplated in the Agreement, Mr. Steele sought a modification of terms to pay the Amount Sold balance, but Swift ignored his entreaties. RSI consequently went out of business. Swift did not show that RSI held hard assets of consequence or that RSI transferred to RSW any ongoing jobs subject to Swift's 12% interest in Future Receivables. Instead, Swift assumes this to be the case and rests on mere allegations. Evidentiary support for Swift's position is absent from the record.

Swift does not contend (or at least provided no evidence) that the Purchase Price proceeds were used for "personal, family, or household purposes" rather than business expenses of RSI. While Mr. Steele knew that Swift did not authorize the payments to stop, nothing in record, and no evidence from Swift forecasts or suggests, that Mr. Steele knew, believed, or understood that RSW's receivables were RSI receivables subject to a Swift property claim. Swift did nothing more than occasionally surface to demand payment as would a lender under the circumstances even though it held no collateral. In the absence of evidence to the contrary, the affidavit and its attachments meanwhile affirmatively prove a lack of fraudulent intent on Mr. Steele's part.

Around December 21, 2016, Swift swept the RSI bank account for a last time and seized final funds of about $2,200. These proceeds did not consist of its 12% of Future Receivables as defined in the Agreement. *See* Dkt. 43 at 56. On December 29, 2016, Swift's lawyer sent Mr. Steele a demand letter, Dkt. 43 at 58-59 (Exhibit G), and an arbitration proceeding was filed by it against Mr. Steele and RSI, Dkt. 43 at 63-81 (Exhibit I) about a month later. The arbitration panel subsequently issued a monetary award founded on breach of contract, warranty, and guaranty, but not fraud. Dkt. 43 at 87-89. RSI had closed by then and Mr. Steele perceived that he was able to generate new business in 2017 operating RSW (not RSI).

In response, nothing on the record indicates that Swift owned 12% of RSW receivables assets in 2017 or held a security interest in any hard assets transferred to RSW, if any were. As asserted by Swift and established from the terms of the Agreement, Swift was not a lender but rather a purchaser of assets. Swift cannot have it both ways. The arbitration award is limited to breach of the Agreement and does not find fraud. It is a final award and no basis to go beyond its findings have been provided.

Because Mr. Steele has shown with uncontradicted evidence that he did not act with fraudulent intent, the third element is not met, and the Embezzlement Claim fails, even when taken in the light most favorable to Swift as the nonmoving party. As the defendant, Mr. Steele is only required to show that one element of the claim cannot be met, which he has done. Accordingly, Mr. Steele's Motion for Summary Judgment will be granted.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED that:

1. The motion for summary judgment filed by the plaintiff, Swift Financial Corporation d/b/a Swift Capital be and hereby is DENIED.

2. The motion for summary judgment filed by the defendant, Robert W. Steele, II, be and hereby is ALLOWED.

3. A separate judgment will be entered in favor of the Defendant. Both parties shall bear their own costs.

**END OF DOCUMENT**